UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WORKHORSE GROUP INC. and WORKHORSE TECHNOLOGIES INC., | : : : | Case No. 1:22-cv-454 |
| Plaintiffs, | : : | Judge Timothy S. Black |
| vs. | : : | |
| WEI WEI, HAONAN (LEO) ZHANG, and ARC UAS, INC., | : : : | |
| Defendants. | : : | |

**ORDER DENYING DEFENDANTS' PARTIAL MOTION TO DISMISS (Doc. 21)**

This civil case is before the Court on Defendants Wei Wei ("Wei"), Haonan (Leo) Zhang ("Zhang"), and ARC UAS, Inc.'s ("Arc") (collectively, "Defendants") partial motion to dismiss the first amended complaint (Doc. 21) and the parties' responsive memoranda (Docs. 23, 24).

## I. BACKGROUND[1]

**A. Workhorse's Business**

Plaintiff Workhorse Technologies Inc. ("Workhorse Technologies") is a wholly owned subsidiary of Plaintiff Workhorse Group Inc. ("Workhorse Group") (collectively, "Workhorse"). (Doc. 20 at 1 n.1). Workhorse is a technology company that "designs and manufactures all-electric delivery trucks and drone systems, including the technology

---

[1] The facts are taken from the allegations in the First Amended Complaint (Doc. 20) (the "Complaint"), which facts are accepted as true for purposes of this motion, in accordance with the standard for dismissal under Fed. R. Civ. P. 12(b)(6).

that optimizes the way these vehicles operate." (*Id.* at ¶ 31). Through its aerospace division, Workhorse is also in the business of autonomous package delivery via unmanned aerial vehicles ("UAV"), also known as drones. (*Id.* at ¶ 35). The Horsefly™ UAV ("Horsefly") is Workhorse's custom-built, high-efficiency delivery UAV, which was designed to be fully autonomous as well as work in tandem with Workhorse's all-electric delivery vans. (*Id.* at ¶¶ 36, 37). Workhorse also built Aeres App ("Aeres"), an application that connects to the Horsefly drone. (*Id.* at ¶ 39).

### B. Workhorse's Trade Secrets

The Horsefly, and other Workhorse products, operate using "Workhorse's proprietary, confidential, and trade secret software, technology, and hardware[,] including information related to package delivery; carriage of sensors; data collection and integration; flight operations procedures; maintenance operations procedures; quality control systems and procedures; system reliability systems and procedures; system availability procedures; systems integration products for lowering the total cost of ownership of Workhorse's products; redundancy in systems design; safety in systems design and execution; and design for ease of maintenance" (collectively, the "Workhorse Trade Secrets"). (*Id.* at ¶ 43).

Workhorse takes many precautions to prevent the unauthorized access, disclosure, and use of Workhorse Trade Secrets, including entering into agreements, such as the Wei Agreement and the Zhang IP Agreement (*see infra* at 4-6), which impose contractual restrictions and requirements on employees regarding protecting, accessing, and using Workhorse Trade Secrets. (*Id.* at ¶¶ 48, 49). Additionally, Workhorse implements

2

policies for the purpose of protecting Workhorse Trade Secrets, including "Workhorse's Company Access and Keycards, Visitor Check-In and Guest Badge Process, Outside Employment / Moonlighting, Solicitation, and External Communications and Social Media policies." (*Id.* at ¶ 51). Wei and Zhang each provided acknowledgements that they received and agreed to comply with these various policies. (*Id.* at ¶ 52). Upon separation of employment for any reason, Workhorse requires employees to immediately stop using and return all Workhorse property, including Workhorse Trade Secrets, and prevents former employees' access to Workhorse Trade Secrets by cutting off access to its facilities, systems, and data storage. (*Id.* at ¶¶ 66, 67).

**C. Wei's Employment with Workhorse**

Wei was hired by Workhorse on June 15, 2017 in the position of Aerospace Engineer. (*Id.* at ¶ 69). On August 5, 2019, Wei executed a Confidentiality and Proprietary Rights Agreement (the "Wei Agreement") (Doc. 20-1). (Doc. 20 at ¶ 5). Among other things, the Wei Agreement precluded Wei from disclosing, retaining, or misusing Workhorse Trade Secrets, and assigned all rights in Wei's creations, inventions, and innovations during Wei's employment to Workhorse. (*Id.* at ¶ 71; Doc. 20-1 at 3-4, ¶¶ 1(b)(i)(1)-(3)). Wei further acknowledged that his obligations under the Wei Agreement with regard to Workhorse Trade Secrets commenced immediately upon his first access to such information and would continue during and after his employment. (Doc. 20-1 at 4-5, ¶ 1(c)). Wei assigned all rights in products and information he created or worked on during his employment to Workhorse. (*Id.* at 5, ¶ 2(a)).

3

On January 19, 2020, Wei assumed the position of Chief Engineer for Aerospace, which he held until his termination on April 11, 2022. (Doc. 20 at ¶ 80). As Chief Engineer for Aerospace, Wei led the entire staff of professional engineers in his division and was responsible for all phases of developing and testing the Workhorse Unmanned Aerial System ("UAS"). (*Id.* at ¶¶ 81, 84). Wei was also part of the Senior Leadership Team, where he regularly participated in leadership meetings, helped hire staff, and had a large voice in setting the direction and strategy of the entire business. (*Id.* at ¶ 86). Wei interfaced regularly with key customers, helping Workhorse understand its needs and designing capabilities to meet those needs. (*Id.* at ¶ 86).

Wei was granted access to Workhorse Trade Secrets to facilitate the performance of his job duties, and he contributed substantially to the invention of Workhorse Trade Secrets in the course of his employment. (*Id.* at ¶¶ 91, 92). In addition, and separate from Workhorse Trade Secrets, Wei is credited as an inventor on all patents filed to date by Workhorse that protect the Horsefly Technology. (*Id.* at ¶ 93). At the time of his termination, Wei was compensated at a rate of $112.20 per hour, earning a total of $316,742.56 in 2021, and $70,834.15 for the portion of 2022 during which he was employed by Workhorse. (*Id.* at ¶ 82).

**D. Zhang's Employment with Workhorse**

Zhang was hired by Workhorse on September 24, 2018 in the position of Aerodynamics and Flight Controls Engineer for Aerospace. (*Id.* at ¶¶ 94, 115). On August 5, 2019, Zhang executed a Confidentiality and Proprietary Rights Agreement (the "Zhang IP Agreement") (Doc. 20-2). (Doc. 20 at ¶ 6). Like the Wei Agreement, the

4

Zhang IP Agreement precluded Zhang from disclosing, retaining, or misusing Workhorse Trade Secrets, and assigned all rights in Zhang's creations, inventions, and innovations during Zhang's employment to Workhorse. (*Id.* at ¶ 96). Also, like Wei, Zhang acknowledged that his obligations under the Wei Agreement with regard to Workhorse Trade Secrets commenced immediately upon his first access to such information and would continue during and after his employment. (Doc. 20-2 at 4-5, ¶ 1(c)). Zhang assigned all rights in products and information he created or worked on during his employment to Workhorse. (*Id.* at 5, ¶ 2(a)).

On September 17, 2019, Zhang executed a Non-Compete Agreement (the "Zhang Non-Compete Agreement") (Doc. 20-3). (Doc. 20 at ¶ 6). Among other things, the Zhang Non-Compete Agreement prohibited Zhang from competing with Workhorse for the period of his employment and for twelve months thereafter. (*Id.* at ¶ 106; Doc. 20-3 at 4-5, ¶ 2(b)). The Zhang Non-Compete Agreement also prohibited Zhang from soliciting, hiring, recruiting, or attempting to solicit, hire, or recruit any Workhorse employee. (Doc. 20 at ¶¶ 109, 110; *see* Doc. 20-3 at 5, ¶ 2(c)).

At the time of his resignation, Zhang was compensated at a rate of $85,000 per year. (Doc. 20 at ¶ 114). Zhang reported directly to Wei, the Chief Engineer. (*Id.* at ¶ 115). As an Aerospace Engineer, Zhang was responsible for all phases of developing and testing flight control system boards and the respective embedded software for commercial drones and manned aircrafts. (*Id.* at ¶ 116). Zhang was granted access to Workhorse Trade Secrets to facilitate the performance of his job duties, and he contributed substantially to the invention of Workhorse Trade Secrets. (*Id.* at ¶¶ 119,

5

120). In addition, and separate from Workhorse Trade Secrets, Zhang is credited as an inventor on 11 patents and/or pending patent applications filed by Workhorse that protect the Horsefly Technology. (*Id.* at ¶ 121). Zhang resigned from his employment with Workhorse on October 15, 2021. (*Id.* at ¶ 122).

### E. ARC

On May 21, 2019, while simultaneously employed by Workhorse, Zhang founded and began working for ARC. (*Id.* at ¶ 123). On April 8, 2022, Workhorse learned that Wei, while simultaneously employed by Workhorse, was working with Zhang to raise funds for an unknown entity operating in the business of drones, which Workhorse later learned to be ARC. (*Id.* at ¶ 124). Specifically, Workhorse learned that Wei was prominently featured in a slide deck prepared to educate potential investors about ARC's product development and to encourage investment in the company. (*Id.* at ¶ 125).

Upon learning that Wei was apparently working for ARC, a direct competitor, Workhorse leadership met with Wei on April 11, 2022. (*Id.* at ¶ 126). During the meeting, Wei admitted that he had been working with Zhang since the spring of 2021 to research, develop, and manufacture drones; and spoke to Zhang as frequently as two to three times per week regarding ARC and its plans. (*Id.* at ¶¶ 127, 128). Wei also admitted to having seen the pitch slide deck being presented to potential ARC investors, in which he was featured, and acknowledged that it was inappropriate for him to be featured in a pitch slide deck for a drone company while he was employed as Chief Engineer of Workhorse's Aerospace division. (*Id.* at ¶¶ 129, 130). Wei's employment was terminated effective immediately. (*Id.* at ¶ 132). Wei was escorted to his office to

gather his personal belongings, and then escorted out of the building. (*Id.* at ¶ 133). Wei was asked to turn over all Workhorse property in his possession. (*Id.* at ¶ 134).

After terminating Wei's employment, Workhorse engaged an independent company to forensically analyze Wei's work devices. (*Id.* at ¶ 135). Workhorse's counsel sent Wei and Zhang cease-and-desist letters demanding that they immediately stop using Workhorse Trade Secrets and return the same. (*Id.* at ¶ 136). The letters advised that Workhorse was investigating the matter and would be monitoring all unlawful activities and attempts to divert business from Workhorse. (*Id.* at ¶ 137). The letters also demanded that Wei and Zhang provide information to Workhorse regarding the extent of their activities. (*Id.* at ¶ 138).

Through counsel, Wei took the position that ARC's business was solely related to the use of drones for the delivery of medical products. (*Id.* at ¶ 140). In the course of its investigation, Workhorse reviewed the website for ARC, which indicated that ARC was not solely in the business of drones for the delivery of medical products. (*Id.* at ¶ 141). Rather, ARC's business was in direct competition with Workhorse's Horsefly drone and related products and services. (*Id.* at ¶ 142). Specifically, ARC marketed itself as being in the business of autonomous last mile delivery and represented that its product line included a drone designed to carry and deliver packages, a hub which served as a take-off and landing point for its drones, and software to facilitate the use of its drone and other products. (*Id.* at ¶¶ 143-46). Through counsel, Wei also took the position that his name had been used in the ARC pitch slide deck without his permission. (*Id.* at ¶ 148).

7

Workhorse's forensic analysis investigation made the following findings: (i) Wei had maintained and accessed several email accounts on his work computer during his employment with Workhorse, including an account on ARC's email domain (*Id.* at ¶ 149); (ii) Wei had deleted more than 31,000 files from his work computer since December 17, 2021 (*Id.* at ¶ 150); (iii) more than 25,000 files were deleted over the two-day period of April 5-6, 2022, just days before the ARC pitch slide deck came to light (*Id.* at ¶ 151); and (iv) from January 1, 2021 through April 11, 2022, Wei had connected a total of five USB devices to his work computer, which had not been authorized by Workhorse, and which remained in Wei's possession (*Id.* at ¶¶ 152, 154). The forensic analysis also found substantial evidence of Wei downloading Workhorse Trade Secrets to these USB devices without authorization. (*Id.* at ¶ 155). USB devices were connected to the computer on January 28, 2022, March 2, 2022, March 31, 2022, and April 2, 2022. (*Id.* at ¶ 153). The timing of these USB connections is significant because the ARC pitch slide deck to investors was circulating around the same time, in March and April 2022. (*Id.* at ¶ 156). Wei also accessed Workhorse's cloud storage systems to access Workhorse Trade Secrets around the same time. (*Id.* at ¶ 157).

Counsel for Zhang responded to the cease-and-desist letter by stating that Zhang had returned all Workhorse property and information and had not used it to further a competing business venture, agreed not to interfere with Workhorse's contracts and actual or prospective customers, and confirmed that he would comply with the law going forward. (*Id.* at ¶ 158). In light of the forensic analysis findings, Workhorse's counsel sent follow-up letters to Wei and Zhang. (*Id.* at ¶ 159).

8

Arising from these facts, Workhorse initiated this action, asserting seven counts against Defendants. Defendants now move for partial dismissal, specifically seeking to dismiss Counts I, II, III, and IV, which counts are related to Defendants' alleged misappropriation of trade secrets and breaches of fiduciary duty.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." To show grounds for relief, Fed. R. Civ. P. 8(a) requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

While Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Pleadings offering mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555). In fact, in determining a motion to dismiss, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265 (1986)). Further, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. A claim is plausible where a "plaintiff pleads factual content that allows

9

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and the case shall be dismissed. *Id.* (citing Fed. Rule Civ. P. 8(a)(2)).

### III. ANALYSIS

**A. Counts I & II – Violations of DTSA & OUTSA**

Workhorse asserts claims for misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.*, in Count I, and in violation of Ohio's codification of the Uniform Trade Secrets Act ("OUTSA"), Ohio Revised Code § 1333.61, *et seq.*, in Count II. (Doc. 20 at 31-34).

The requirements for establishing misappropriation of trade secrets are substantially the same under the DTSA and the OUTSA, so the Court analyzes these claims together.[2] *Mesa Indus. v. Charter Indus. Supply, Inc.*, 2022 WL 1044720, at *6 (S.D. Ohio Apr. 7, 2022); *see also PUI Audio, Inc. v. Van Den Broek*, 2021 WL 4905461, at *5 n.5 (S.D. Ohio Oct. 21, 2021) (noting that the "definition of 'trade secret' and 'misappropriation' in the OUTSA and the DTSA are similar" and comparing Ohio Rev. Code §§ 1333.61(B) and (D) with 18 U.S.C. §§ 1839(3) and (5)).

---

[2] The parties also, analyze the DTSA and the OUTSA together. *See* Defendants' Partial Motion to Dismiss First Amended Complaint (Doc. 21 at 8) and Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint (Doc. 23 at 8).

10

"To prevail on a misappropriation of trade secrets claim, a plaintiff must show . . . that: (1) a trade secret exists; (2) the defendants acquired the trade secret because of a confidential relationship; and (3) the defendants used the trade secret without authorization." *Premier Dealer Serv., Inc. v. Allegiance Administrators, LLC*, 2018 WL 5801283 (S.D. Ohio Nov. 6, 2018) (citing *Hoover Transp. Serv., Inc. v. Frye*, 77 Fed. Appx. 776, 782 (6th Cir. 2003)). Here, Defendants do not dispute that one or more trade secrets exist or that said trade secrets were acquired because of a confidential relationship.[3] Instead, Defendants argue that Workhorse has failed to allege misappropriation. (Doc. 21 at 8).

Defendants first argue that Workhorse fails to allege misappropriation because no facts are alleged to support the "conclusory" allegation that "Defendants used improper means to acquire and use Workhorse Trade Secrets while knowing that the acquisition and use was improper." (Doc. 20 at ¶¶ 171, 180; Doc. 21 at 9-11). Workhorse responds that this allegation is part of a larger complaint that includes supporting factual

---

[3] In their reply, for the first time, Defendants state that Workhorse has "not [] identified any trade secrets." (Doc. 24 at 1). But "a reply brief is not the proper place to raise an issue for the first time." *United Tel. Co. of Ohio v. Ameritech Servs., Inc.*, 2011 WL 53462, at *3 n.2 (S.D. Ohio Jan. 7, 2011); *see Cooey v. Strickland*, 2010 WL 3212079, at *12 (S.D. Ohio Aug. 12, 2010) (foregoing consideration of argument improperly raised for first time in reply memorandum). Nevertheless, Workhorse has sufficiently pled the Workhorse Trade Secrets. While Workhorse does not allege direct evidence that Defendants disclosed specific pieces of Workhorse's trade secret information on certain dates or times, Workhorse alleges that (1) Defendants had access to Workhorse's confidential trade secret information; (2) while simultaneously employed by Workhorse, Defendant Zhang founded and worked for ARC, a business in direct competition with Workhorse's Horsefly drone and related products and services; (3) while simultaneously employed by Workhorse, Defendant Wei consulted ARC to research, develop, and manufacture drones; and (4) without authorization, Defendant Wei downloaded Workhorse Trade Secrets onto multiple USB devices between January 2022 and April 2022.

11

allegations, such as allegations that "Wei and Zhang misappropriated its trade secrets, that they did so for the benefit of a competitor—ARC, that they provided Workhorse's trade secrets to ARC, and how those trade secrets have been used by ARC." (Doc. 23 at 12-13). Thus, Workhorse argues it has sufficiently plead actual misappropriation and misuse because the Complaint includes allegations that "Wei and Zhang worked together to bring ARC into direct competition with Workhorse through the development of competitive products and services, [which were] created *using* the Workhorse Trade Secrets." (*Id.* at 13) (emphasis in original).

"Various courts have recognized the difficulty plaintiffs in trade secret cases may have in providing direct evidence to prove misappropriation." *Apex Tool Group LLC v. DMTCO, LLC*, 2014 WL 6748344 at *15 (S.D. Ohio Nov. 26, 2014) (citations omitted). "In most cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege did in fact take place." *Apex*, 2014 WL 6748344 at *15 (quotations omitted). The Sixth Circuit has stated that there is a strong argument that courts may properly consider sufficient circumstantial evidence in trade secret cases, specifically when that evidence demonstrates that "(1) the misappropriating party had access to the secret and (2) the secret and the defendant's design share similar features." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 600 (6th Cir. 2005). The appellate court in *Stratienko* court explained that "[p]ermitting an inference of use from evidence of access and similarity is sound because '[m]isappropriation and misuse can rarely be proved by convincing direct evidence.'" *Id.* at 600 (quoting *Eden Hannon & Co. v.*

12

*Sumitomo Trust & Banking Co.*, 914 F.2d 556, 561 (4th Cir. 1990)).

The Court does not find the allegations concerning misappropriation to be merely conclusory. The Complaint provides sufficient factual support for the allegations in Paragraphs 171 and 180 that Defendants misappropriated Workhorse's trade secrets. For example, Workhorse alleges Wei and Zhang were granted access to Trade Secrets and contributed substantially to the invention of the same (Doc. 20 at ¶¶ 91, 92, 119, 120). Workhorse alleges that in May of 2019, Zhang founded and began working for ARC while he was simultaneously employed by Workhorse (Doc. 20 at ¶ 123) and that Wei admitted he had been working with Zhang since the spring of 2021 to research, develop, and manufacture drones (Doc. 20 at ¶ 127). Workhorse alleges that ARC's business was in direct competition with Workhorse's Horsefly drone and related products and services (Doc. 20 at ¶¶ 142-46). Finally, Workhorse alleges that forensic analysis revealed Wei maintained and accessed email on ARC's email domain from his work computer (Doc. 20 at ¶ 149) and connected five USB devices to his work computer on which he downloaded Workhorse Trade Secrets without authorization between January 2022 and April 2022 (Doc. 20 at ¶¶ 152, 154, 155). These allegations provide sufficient factual support for Workhorse's misappropriation claim to withstand dismissal pursuant to Rule 12(b)(6).

Defendants next argue that Workhorse's misappropriation claims "are all solely based on its 'information and belief' without any underlying factual support." (Doc. 21 at 11). Courts, however, "permit[] pleading on information and belief in certain circumstances, such as when a plaintiff may lack personal knowledge of a fact," but has

13

"sufficient data to justify interposing an allegation on the subject," or is required to rely on "information furnished by others." *Apex*, 2014 WL 6748344, at *9 (citing *Starkey v. JPMorgan Chase Bank, N.A.*, 2014 Fed. Appx. 444 (6th Cir. 2014)).

The Court finds this argument similarly unconvincing, as the Complaint includes sufficient factual allegations to support Workhorse's claims of misappropriation, as set forth above. Moreover, only seven of the 222 paragraphs in the Complaint are made on "information and belief," and these allegations bear on matters that are either not within Workhorse's knowledge or where Workhorse has provided other supporting factual allegations. *See* Doc. 20 at ¶¶ 3, 4 (alleging that Wei also used Workhorse Trade Secrets for the benefit of "other third parties"), ¶ 13 (alleging Zhang resides in Cincinnati, Ohio), ¶ 123 (alleging that on May 21, 2019, Zhang founded ARC), ¶ 154 (alleging the five USB devices remain in Wei's possession), ¶ 162 (alleging Defendants are using Workhorse Trade Secrets), and ¶ 212 (alleging Zhang failed to return Workhorse property upon separation).

Thus, when reading the Complaint as a whole, and viewing the allegations in a light most favorable to Workhorse, these allegations are sufficient to state a claim for relief for misappropriation of trade secrets. *See More than Gourmet, Inc. v. Finnegan*, 2019 WL 13199822 at *8 (N.D. Ohio Sept. 10, 2019) (plausible misappropriation claim sufficient to withstand 12(b)(6) where plaintiff alleged defendant "acquired, developed, and had access to confidential trade secret information by virtue of his long time, high level positions" and "used [plaintiff's] confidential, proprietary, and trade secret information"

14

and "that [plaintiff] and [defendant] are direct competitors").

Accordingly, the Court denies Defendants' motion to dismiss Counts I and II.

### B. Counts III & IV – Breach of Fiduciary Duty

Defendants argue Counts III & IV, for breaches of fiduciary duty against Wei and Zhang, respectively, are preempted by the OUTSA because the claims are "explicitly based upon the same facts as Workhorse's OUTSA and DTSA claims in Counts I and II." (Doc. 21 at 13). Workhorse responds that its breach of fiduciary duty claims are "independent" of and not preempted by the OUTSA because the claims "describe conduct that breaches the duty [] in a manner that is not solely focused on the stealing of information" (Doc. 23 at 15-16). Specifically, Workhorse explains the distinction: its "OUTSA claim focuses on Wei and Zhang wrongfully taking and using the Workhorse Trade Secrets," while its "breach of fiduciary duty claims focus on [Wei and Zhang] working for a competitive entity in the drone delivery sector[.]" (*Id.* at 16). Workhorse argues that allegations in the Complaint that: (a) Wei and Zhang were "planning the business activities of ARC and also soliciting investors in order to fund their covert enterprise—during periods of time they were still Workhorse employees," and that (b) "Wei maintained and accessed an ARC-affiliated email address while he still served as Chief Engineer of Workhorse's Aerospace division," are factual allegations uniquely supportive of its breach of fiduciary duty claims. (*Id.* at 16). Crucially, "these acts have nothing to do with trade secret misappropriation—they relate to Wei's and Zhang's failure to put forth their best effort on behalf of Workhorse while actively competing with Workhorse through ARC." (*Id.* at 16).

15

The OUTSA preempts "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67; *see also Stolle Mach. Co. v. RAM Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015); *Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg. Inc.*, 649 F. Supp. 2d 702, 720-22 (N.D. Ohio 2009). The purpose of the OUTSA's preemption provision is to create an exclusive remedy for misappropriation of trade secrets, thereby "prevent[ing] inconsistent theories of relief for the same underlying harm." *Office Depot, Inc. v. Impact Office Prod., LLC*, 821 F. Supp. 2d 912, 918 (N.D. Ohio 2011) (quoting *Smithfield Ham & Prods. Co. v. Portion Pac*, 905 F. Supp. 346, 348 (E.D. Va. 1995)).

Although "courts have struggled with the issue of whether the UTSA displaces common-law claims whose factual allegations may touch upon misappropriation-of-trade-secret facts but are intended to address another legal harm[,] . . . [t]he majority interpretation is that common-law claims are preempted only to the extent that they are based on misappropriation-of-trade-secrets facts." *Office Depot*, 821 F. Supp. 2d at 919; *see, e.g., Allied*, 649 F.Supp.2d at 724 ("[W]here a claim for breach of fiduciary duty has an independent factual basis, which is not solely dependent on misappropriation-of-trade-secret facts, courts have concluded there is no preemption."). "Under this approach, courts parse the allegations in support of a claim to determine whether the plaintiff has alleged the 'same facts' or 'same proof' in support of the common law claims." *Office Depot*, 821 F. Supp. at 919 (citing *Allied*, 649 F.Supp.2d at 721). Thus, a non-OUTSA claim survives only if the plaintiff alleges factual matter beyond misappropriation-of-

16

trade-secrets or other information.

Here, viewing the allegations in a light most favorable to Workhorse, the Court finds that Workhorse has sufficiently alleged an independent factual basis for its breach of fiduciary duty claims.[4] Workhorse's allegations regarding Wei's and Zhang's conduct when "planning the business activities of ARC and also soliciting investors in order to fund their covert enterprise—during periods of time they were still Workhorse employees" (Doc. 23 at 16), are facts that are potentially unique and distinct from Workhorse's trade secret claims. And, although it may become clear later in the proceedings that the breach of fiduciary duty claims are preempted, dismissal at this stage, when viewing the allegations in a light most favorable to Workhorse, is premature.

Accordingly, the Court denies Defendants' motion to dismiss Counts III and IV.

### IV.  CONCLUSION

Based upon the foregoing, Defendants' partial motion to dismiss the Complaint (Doc. 21) is **DENIED**.

**IT IS SO ORDERED.**

Date:  1/9/2023

*s/Timothy S. Black*
Timothy S. Black
United States District Judge

---

[4] Notably, every case cited by Defendants in support of their preemption argument considered preemption at the summary judgment level.  *See Stolle*, 605 F. App'x 473; *Allied*, 649 F. Supp. 2d 702; *Guide Techs., LLC v. Killeen*, 2011 WL 13202871 (S.D. Ohio Mar. 21, 2011).